# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

DANIEL JERMAINE USHER,

Defendant.

Case No.: SACR 17-00082-CJC

MEMORANDUM OF DECISION

## I. INTRODUCTION

The United States of America (the "Government") charges Defendant Daniel Jermaine Usher with five counts of bank fraud and three counts of aggravated identity theft. (Dkt. 42 [First Superseding Indictment, hereinafter "FSI"].) Mr. Usher entered a

guilty plea as to all five counts of bank fraud on January 17, 2018. (Dkts. 56, 59.) On January 18, 2018, the Court held a one-day bench trial on the three counts of aggravated identity theft. For the following reasons, the Court finds Mr. Usher guilty on all three counts of aggravated identity theft.

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

Counts Six through Eight of the FSI charge Mr. Usher with aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1). Section 1028A(a)(1) provides that "[w]hoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years." Enumerated felony violations include bank fraud in violation of 18 U.S.C. § 1344. *See* 18 U.S.C. § 1028A(c)(5). In order for Mr. Usher to be found guilty of aggravated identity theft, the Government had to prove the following elements beyond a reasonable doubt: (1) Mr. Usher knowingly transferred, possessed, or used without legal authority a means of identification of another person; (2) He knew that the means of identification belonged to a real person; and (3) He did so during and in relation to a felony violation of one of the offenses enumerated in § 1028A(c). *See* Ninth Circuit Model Instr. 8.83; 18 U.S.C. § 1028A(a)(1).

Under the statute, "means of identification" is defined in relevant part as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any: . . . (C) unique electronic identification number, address, or routing code; or (D) telecommunication identifying information or access device (as defined in section 1029(e))." *See* 18 U.S.C. § 1028(d)(7). The Ninth Circuit has interpreted "means of identification" broadly. *See United States v. Blixt*, 548

F.3d 882, 887 (9th Cir. 2008) ("By using the word 'any' . . . [18 U.S.C. § 1028(d)(7)] reflects Congress's intention to construct an expansive definition.") The term "access device" is defined as "any card, plate, code, account number, electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument)." *See* 18 U.S.C. § 1029(e)(1).

The Government proved beyond a reasonable doubt that on February 2, 2016, March 13, 2016, and April 3, 2016, Mr. Usher knowingly used a fraudulently obtained ATM personal identification number ("PIN") belonging to victims G.L., J.R., and D.T.N., respectively, to obtain funds from the Bank of America ("BOA") accounts for each victim in violation of 18 U.S.C. § 1344.

The Government presented evidence that on these dates, when a BOA accountholder used an ATM machine, the accountholder was required to insert his ATM card and enter his PIN to start an ATM transaction and to perform any subsequent ATM transaction. (Dkt. 64 [Transcript] at 26–27, 74, 95; Ex. 15 at 11.) A BOA ATM card has a magnetic strip on the back that is encoded with the accountholder's ATM card number, name, address, other account numbers, and date of birth. (Transcript at 69, 72.) When a BOA accountholder finished one ATM transaction, a screen appeared requiring the accountholder to choose one of two options: "No, I'm finished" or "Yes." (*Id*. at 95; Ex. 15 at 11.) The accountholder's ATM card would be returned to him when this screen appeared, (Transcript at 86–87), but the ATM machine would keep the accountholder's profile open on BOA's main database of computers, (*id*. at 79, 82–83). If the accountholder did not choose one of these two options, this ATM screen would remain

open for five to eight, but no more than ten, seconds. (*Id.* at 74–75.) If the accountholder chose "Yes," he would be required to re-enter his PIN. (*Id.* at 95.)[1]

The evidence showed that Mr. Usher would stand behind and watch an accountholder conduct an ATM transaction, wait until the accountholder inadvertently left without closing out the ATM session, approach the ATM machine and choose the "Yes" option, input the accountholder's PIN, and fraudulently withdraw funds from the accountholder's account. Surveillance video captured Defendant perform these acts using each of the three victims' PINs. (Transcript at 41–42; Exs. 2, 4, 5.) There was no evidence or indication that the ATM machines used by the three victims and by Mr. Usher were malfunctioning. (Transcript at 97–98.) Christopher Thompson, a vice president and bank fraud investigator at BOA, testified that if the ATM machine was not functioning properly the relevant Switch Report[2] would have shown an error code. (*Id.*)[3]

The Government presented evidence that on February 2, 2016, victim G.L. used a BOA ATM machine at 5440 Topanga Canyon Boulevard in Woodland Hills, California. (*Id.* at 41; Ex. 2.) While G.L. used the ATM machine, Mr. Usher watched G.L. complete his transaction from over G.L.'s shoulder. (Ex. 2 at 12:23:53-12:24:44.) The Switch

---

[1] Mr. Usher argues that there was no "conclusive evidence" that a PIN was actually re-entered into the ATM by Mr. Usher during the transactions at issue, such as evidence of the PIN numbers used, records stating that PIN number was entered, or surveillance video from an angle that shows Mr. Usher re-entering a PIN. (Dkt. 67 at 5–6, 8–10.) However, the Government's witnesses from BOA consistently testified that re-entering a PIN number was required for each transaction conducted at an ATM machine during this time period.

[2] A Switch Report shows all the transactions, from multiple bank customers, for an ATM machine, and contains the following information: "the card number, the account number, the dollar amount of a transaction, the date, the time, the location information and the sequence number of a transaction." (Transcript at 23.)

[3] Mr. Usher points out that none of the Government's witnesses testified that they knew or had checked whether the specific ATM machines at issue were functioning as intended on the dates alleged in the FSI. (Transcript at 33, 47, 85–86.) Nonetheless, there was no evidence that the ATM machines Mr. Usher used to complete his fraudulent transactions were malfunctioning when he used them.

Report for this ATM machine showed that G.L. withdrew $100 from his account, (Transcript at 23–24; Ex. 9A), then left the ATM machine, (Ex. 2 at 12:24:44). Mr. Usher quickly approached the same machine and used it to make a transaction. (*Id*. at 12:24:44-12:26:39.) The Switch Report for this ATM machine showed that when Mr. Usher was using the ATM, $600 was withdrawn in a subsequent transaction that required a PIN submission, and other withdrawal requests that required a PIN submission were made but rejected by the system. (Transcript at 23–24, 26–27, 68–69, 72–73; Ex. 9A.) G.L. testified that he did not make any additional withdrawals after the $100 withdrawal from the BOA ATM that day. (Transcript at 102–03.) He also testified that he did not give anyone permission to use his ATM card or PIN. (*Id*.) After G.L. made a fraud complaint, BOA reimbursed G.L. for the $600 that was withdrawn from his account when Mr. Usher used the ATM. (Transcript at 25; Ex. 9B.)

The Government also presented evidence that on March 13, 2016, victim J.R. used a BOA ATM machine at 13952 Brookhurst Street in Garden Grove, California. (Transcript at 42; Ex. 4.) While J.R. used the ATM machine, Mr. Usher watched J.R. (Ex. 4 at 13:07:50-13:09:00.) The Switch Report for this ATM machine showed that after J.R. inserted his ATM card and his PIN, he withdrew $300 from his account, (Transcript at 25–28; Ex. 11A), then left the ATM machine, (Ex. 4 at 13:09:00). Mr. Usher then quickly approached the same ATM and used it to make a transaction. (Ex. 4 at 13:09:01-13:10:10; Ex. 11A.) The Switch Report for this ATM machine showed that when Mr. Usher was using the ATM, $600 was withdrawn in a subsequent transaction that required a PIN submission, and other withdrawal requests that required a PIN submission were made but rejected by the system. (Transcript at 25–28, 68–69, 72–73; Ex. 11A.) J.R. testified that he did not make any additional withdrawals from the BOA ATM that day. (Transcript at 107–08.) He also testified that he did not give anyone permission to use his ATM card or PIN. (*Id*.) After J.R. made a fraud complaint, BOA

reimbursed J.R. for the $600 that was withdrawn from his account when Mr. Usher used the ATM.  (*Id.* at 25; Ex. 11B.)

The Government also presented evidence that on April 3, 2016, victim D.T.N. used a BOA ATM machine at 13952 Brookhurst Street in Garden Grove, California. (Transcript at 42; Ex. 5.)  Mr. Usher watched as D.T.N. used the ATM machine. (Ex. 5 at 12:00:06-12:02:44.)  The Switch Report for this ATM machine showed that after D.T.N. inserted his ATM card and his PIN, he withdrew $40 from his account, (Transcript at 28–29; Ex. 12A), then left the ATM machine, (Ex. 5 at 12:02:41).  Mr. Usher quickly approached the same ATM and used it to make a transaction.  (Ex. 5 at 12:02:45-12:03:58.)  The Switch Report for this ATM machine showed that when Mr. Usher was using the ATM, $420 was withdrawn in a subsequent transaction that required a PIN submission, and other withdrawal requests that required a PIN submission were made but rejected by the system. (Transcript at 28–29, 68–69, 72–73; Ex. 12A.)  D.T.N. testified that he did not make any additional withdrawals from the BOA ATM that day, nor did he give anyone permission to use his ATM card.  (Transcript at 112–13.)  After D.T.N. made a fraud complaint, BOA reimbursed D.T.N. for the $420 that was withdrawn from his account when Mr. Usher used the ATM.  (*Id.*at 29; Ex. 12B.) D.T.N.'s filing of a fraud complaint indicates that D.T.N. did not give Mr. Usher permission to use his PIN.

The victims' ATM PINs are a "means of identification" under Section 1028(d)(7). BOA uses an accountholder's ATM PIN in conjunction with his BOA ATM card/card number to identify the accountholder.  (Transcript at 68, 77–78.)  Mr. Usher claims that an ATM PIN is not a "means of identification."  (Dkt. 67 at 12–14.)  Mr. Usher argues that the language of Section 1028(d)(7) does not include, specifically, an "ATM personal identification number," and that the legislative history indicates that Congress did not intend to include an ATM PIN within the meaning of "means of identification" in Section

1028. (*Id.*) The Court disagrees. An ATM PIN is a number that is used, alone or in conjunction with other information contained on an ATM card, to identify a specific individual, the bank accountholder, within the general definition of the term "means of identification" set forth in Section 1028(d)(7). An ATM PIN ensures that the bank accountholder is using the ATM card to conduct a transaction with the accountholder's account. Additionally, an ATM PIN is both a "unique electronic identification number" and an "access device" within the meaning of those "means of identification" defined in subsections (C) and (D) of Section 1028(d)(7). An ATM PIN is a "unique electronic identification number" because it is used to execute bank transactions electronically and it is personal or unique to the bank accountholder. An ATM PIN is an "access device" because it is a code or personal identification number that can be used, alone or in conjunction with another access device, to obtain money within the definition of an "access device" set forth in Section 1029(e)(1). Because the wording of the statute is plain and clear, the legislative history cited by Mr. Usher cannot be used to alter or limit the scope of Section 1028A.

Based on the evidence presented and the testimony heard, the Court finds that the Government proved beyond a reasonable doubt that Mr. Usher used the three victims' BOA PINs and ATM cards, and the information contained therein, to fraudulently withdraw funds from their accounts. The Government provided evidence that in making these withdrawals, Mr. Usher was required to re-enter the accountholder's PIN to complete the transaction. The Government also provided evidence that although the ATM machine returned the physical ATM card to each victim before Mr. Usher approached, the encoded information on the ATM card was still open in the ATM machine system. By fraudulently withdrawing cash while the accountholder's ATM account was still open, Mr. Usher used each victims' ATM PIN and converted each victims' encoded ATM card information in order to withdraw funds from the victims' BOA accounts. Section 1028(A) does not define "use," thus the Court must "construe it

in accord with its ordinary or natural meaning." *Smith v. United States*, 508 U.S. 223, 228 (1993). The Supreme Court has repeatedly explained that the "ordinary or natural" meanings of the term "use" include: "'[t]o convert to one's service,' 'to employ,' 'to avail oneself of,' and 'to carry out a purpose or action by means of.'" *Bailey v. United States*, 516 U.S. 137, 145 (1995) (quoting *Smith*, 508 U.S. at 228-29), *superseded by statute on other grounds*, 18 U.S.C. § 924(c)(1)(A). Mr. Usher piggybacked off of the victims' use of their ATM cards and the encoded information therein and misrepresented himself as the victims by re-entering their PIN to fraudulently withdraw funds. Mr. Usher's actions clearly constitute a "use" of the victims' ATM cards within the ordinary and natural meaning of the term.

The Government also proved beyond a reasonable doubt that Mr. Usher knew that the means of identification he was using belonged to another person. Mr. Usher watched each of the three victims perform a transaction on an ATM machine, then quickly approached so that he could use their still open account.

Mr. Usher pleaded guilty to three counts of bank fraud which dealt with his fraudulent withdrawal from each of the three victims' accounts. Thus, the Government proved beyond a reasonable doubt that Mr. Usher used the victims' ATM PIN numbers in conjunction with their ATM card numbers during and in relation to his commission of bank fraud.

Taken together, the evidence presented proves beyond a reasonable doubt that in using G.L., J.R., and D.T.N.'s BOA PINs and ATM cards on February 2, 2016, March 13, 2016, and April 3, 2016, to make fraudulent withdrawals, Mr. Usher knew that he was using a means of identification belonging to another person. The Court therefore finds Mr. Usher guilty on Counts Six, Seven, and Eight for aggravated identity theft in violation of 18 U.S.C. § 1028A.

## III. CONCLUSION

For the foregoing reasons, the Court finds Mr. Usher guilty on Counts Six through Eight for aggravated identity theft in violation of 18 U.S.C. § 1028A.

DATED: February 22, 2018

_____
CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE